# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 1:14-cr-00051-TLS-SLC |
| | ) | |
| JAVON BURNETT | ) | |

## REPORT AND RECOMMENDATION

Before the Court is a motion to suppress (DE 19) filed by Defendant Javon Burnett. Burnett seeks to suppress a firearm discovered by police in the car he was driving on September 30, 2014. Burnett contends that he was stopped by the police without probable cause or reasonable suspicion, and he further argues that the police searched his person and the vehicle without justification or authority.

### *A. Background*

On December 17, 2014, Burnett was indicted for a violation of 18 U.S.C. § 922(g)(1), being a felon in possession of a firearm. On February 27, 2015, Burnett pleaded not guilty. On May 5, 2015, Burnett filed the present motion (DE 19), and the government filed a response in opposition to Burnett's motion (DE 21) on May 29, 2015. This matter was referred to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1). (DE 22). An evidentiary hearing on this matter was held on October 7, 2015. (DE 32). On December 9, 2015, Burnett timely filed a post-hearing brief in support of his motion to suppress. (DE 35). The government requested and received an extension of time to file its response (DE 36; DE 37), and then filed its response within the extended deadline on January 19, 2016 (DE 38). Burnett filed his reply brief on February 2, 2016, which was outside the Court's deadline; given the government's deadline extension, however, the Court deems Burnett's reply

to have been timely filed. (DE 39). After considering the evidence and argument submitted by the parties in this matter, I RECOMMEND that Burnett's motion to suppress be DENIED.

## B. Findings of Fact

At the evidentiary hearing, the government offered the testimony of Officer Jason Fuhrman and Officer Miguel Rivera of the Fort Wayne Police Department. Burnett offered the testimony of Officer Will Winston of the Fort Wayne Police Department and Tramane Scott, who was a passenger in Burnett's vehicle at the time of the traffic stop. The testimony of Officers Fuhrman, Rivera, and Winston was not contested in any meaningful way at the hearing and I FIND their testimony to be entirely credible.

Officer Fuhrman testified as follows: On September 30, 2014, he and his partner, Officer Winston, were patrolling the southeast portion of Fort Wayne on third shift. (DE 34, Transcript ("Tr.") 7-8). At around 11:16 p.m. that night, Officers Fuhrman and Winston were in the area of Pettit Avenue and Warsaw Avenue, which is a high crime area. (Tr. 8). The officers were sitting parked in their patrol car in the side parking lot of Yeoman's Auto service station, facing north toward Pettit Avenue. (Tr. 8). The officers observed a dark, blue-colored Chevy Malibu that was traveling eastbound on Pettit Avenue, which passed where the officers were sitting and "appeared to speed up as it was passing" the officers. (Tr. 9).

About 12 seconds after the Malibu went by them, the officers started pulling out of the parking lot, when they saw the Malibu turn left onto Hanna Street "at a high rate of speed." (Tr. 9). While the officers did not know how fast the Malibu was going exactly, as they did not have radar, the Malibu "zipped around [the corner] pretty quick" without slowing down and stopping before turning. (Tr. 26). The officers then tried to catch up with the Malibu on Hanna Street, but

2

they were unable to catch up with the Malibu until it had pulled over and stopped on another street, Sherwood Terrace. (Tr. 9-10). Officer Fuhrman reached speeds of 69 miles per hour and was still unable to catch up to the Malibu. (Tr. 29). The driver of the Malibu failed to properly signal the turn onto Sherwood Terrace from Hanna Street, as the driver signaled but "did not signal 200 feet prior to the turn like Indiana State law says he has to." (Tr. 10). The officers then pulled up behind the Malibu, activated the patrol car's lights, and proceeded to perform a traffic stop of the vehicle. (Tr. 10).

Officer Fuhrman approached the driver's side of the vehicle while Officer Winston approached the passenger side of the vehicle. (Tr. 10-11). Officer Fuhrman made contact with the driver of the Malibu, Burnett. (Tr. 11). There were two other occupants in the vehicle, Tramane Scott in the front passenger seat, and Duprece Walker in the back seat on the passenger side. (Tr. 12). While Officer Fuhrman was talking with Burnett, he was also "looking around in the vehicle" to "make sure there weren't any weapons or anything of that nature," when he "looked down at the floor of the car in front of [Burnett] and observed a handgun laying on the floor with an extended magazine in the handgun." (Tr. 12). Burnett's window was down so that Officer Fuhrman could see into the car, and he saw the handgun located at Burnett's feet. (Tr. 12).

Burnett and his passengers were all still located inside the car at this point. (Tr. 13). When Officer Fuhrman saw the handgun at Burnett's feet, he drew his duty weapon, pointed it at Burnett, and told everyone in the car to put their hands up in front of them and keep them up where the officers could see them. (Tr. 13). Officer Fuhrman told Burnett that "if he reached down, [Officer Fuhrman] was going to shoot him." (Tr. 13). Officer Fuhrman then asked the

3

occupants of the car if there were any other weapons in the car, and Tramane Scott stated that he had a handgun on his hip, for which he had a handgun permit. (Tr. 15). Burnett did not advise or produce a handgun permit. (Tr. 15).

Officer Fuhrman called for urgent assistance from other officers, because it was not safe for him and Officer Winston to pull the occupants of the Malibu out of the car at that time, since they were outnumbered and there were weapons in the vehicle. (Tr. 15). Additional officers responded to assist them, and then they began removing the people from the car, starting with Burnett first. (Tr. 15-16). Officer Fuhrman "checked and double checked to make sure that he didn't have any other weapons on him" before walking Burnett back to the squad car, while the other officers pulled the other occupants out of the other side of the car. (Tr. 16). Officers removed the handgun from Tramane Scott's person when he was taken out of the car. (Tr. 16).

Officer Fuhrman's patrol car's in-car video captured the traffic stop of Burnett and the ensuing events. (Tr. 16). Officer Fuhrman reviewed the video prior to the hearing and represented that the events captured on the video "fairly and accurately represent and depict the events [o]f September 30th, 2014 surrounding [his] interaction with Javon Burnett and the Malibu." (Tr. 17). The government submitted the video as Government's Exhibit 4. (Tr. 17).

Officer Fuhrman verified Tramane Scott's handgun permit; after checking in with Fort Wayne records, he found that Scott was the only one in the car with a permit. (Tr. 18). Officer Fuhrman was advised by Fort Wayne police records that Burnett had a previous conviction, for burglary. (Tr. 18). The officers seized both firearms, and the Malibu was inventoried and then towed. (Tr. 19).

When asked when he first intended to pull the Malibu over, Officer Fuhrman stated that

4

he "intended to pull him over pretty close to when [he] left the parking lot," and that he was "going to follow [the Malibu] to see if [the driver] was still driving that way." (Tr. 46). Officer Fuhrman explained that he "was going to see how fast [the Malibu's driver] was driving. [Officer Fuhrman] didn't intend to pull [the Malibu] over until [the officers] turned the corner and [the Malibu] was already quite a ways down the street." (Tr. 47).

Officer Winston issued two citations to Burnett that night, and Officer Fuhrman also signed the citations. (Tr. 26, 29; Def.'s Ex. D). The first citation was for unreasonable speed under Ind. Code § 9-21-5-1. (Tr. 27). Officer Fuhrman explained that the basis of this citation was that the speed limit was 30 miles per hour, and the officers' patrol car was unable to catch up to the Malibu, despite reaching speeds of 69 miles per hour. (Tr. 27-29). Officer Fuhrman did not know the exact speed that Burnett was traveling, and he did not measure the distance traveled, and he did not attempt to time how long it took Burnett's vehicle to travel that distance. (Tr. 29-30). There was other traffic on Hanna Street at the time, and Officer Fuhrman found that Burnett was driving in a dangerous manner "[g]iven the nighttime and the lack of light, and the other vehicles." (Tr. 49). Additionally, Officer Fuhrman found that Burnett turned the corner from Pettit Avenue to Hanna Street at an "excessive" speed "for the corner," and in his opinion Burnett was driving at a speed that was unreasonable. (Tr. 49-50).

The second citation was for failing to properly signal a turn, because "Indiana law requires that a turn be signaled at least 200 feet in advance of that turn." (Tr. 50). Officer Fuhrman explained that he saw the turn signal come on at the same time that the driver of the Malibu hit the brakes. (Tr. 50-51). While Officer Fuhrman never measured the distance from where the car was when the turn signal came on to the corner of Pettit Avenue and Sherwood

5

Terrace, Officer Fuhrman stated that Burnett did not turn on his turn signal prior to 200 feet from the turn. (Tr. 54).

Officer Rivera testified as follows: He was the detective assigned to Burnett's case. (Tr. 60). He watched the video of the traffic stop in this case. (Tr. 63). After seeing the actions of Officers Fuhrman and Winston in conducting the traffic stop of Burnett, as depicted in the video, Officer Rivera would have also done what they did. (Tr. 64). While Officer Winston was a new officer, who had just graduated from the academy, Officer Rivera opined that Officer Winston handled himself well and did what he was supposed to do. (Tr. 65).

Officer Winston testified as follows: He was still in training as of September 30, 2014, when he and Officer Fuhrman conducted a traffic stop of Burnett's vehicle. (Tr. 68). Officer Winston had been riding along with Officer Fuhrman for the month of September. (Tr. 68). Officer Winston did not measure any distances in this case—he did not measure the distance from Yeoman's Service Center parking lot to the corner of Pettit Avenue and Hanna Street; he did not measure the distance from the corner of Pettit Avenue and Hanna Street to the corner of Hanna Street and Sherwood Terrace; and he did not measure the distance from where the Malibu was when its turn signal first activated to the point the Malibu turned onto Sherwood Terrace. (Tr. 69). Nevertheless, Officer Winston, when asked if he saw Burnett do anything unreasonable or imprudent while driving on Pettit Avenue, responded that the Malibu "appeared to be traveling noticeably above the speed limit" when it passed the officers. (Tr. 69). Officer Winston stated that the speed limit there was 30 miles per hour, although it could possibly be 35 miles per hour. (Tr. 69). Officer Winston did not use a radar gun. (Tr. 69-70). Officer Winston also did not measure the time that had elapsed from when he first saw Burnett's vehicle until it

6

turned onto Hanna Street, and he could not accurately state what the vehicle's speed was. (Tr. 70). Officer Winston wrote the citations in this case. (Tr. 70). Officer Winston cited Burnett for traveling at an unsafe speed, not for traveling in excess of the posted speed limit. (Tr. 73).

Tramane Scott testified as follows: He was riding in the Malibu with Burnett on September 30, 2014. (Tr. 76-77). It did not seem to him that the vehicle was traveling faster than it should be on Pettit Avenue or Hanna Street. (Tr. 77). Scott did not see the police car's lights until after Burnett had already turned off his car. (Tr. 77). He had not seen any other weapon in the car, besides his own, when the car was stopped by the police. (Tr. 78). He never actually saw the police remove the weapon from the car until he watched the video. (Tr. 79-80). Scott explained that he never looked down towards Burnett's feet, where the gun was. (Tr. 80). When questioned as to whether he would have seen the gun when he got out of the car, Scott said he thought he would have seen it if it was there. (Tr. 80). He never saw the gun. (Tr. 80). However, he did not get into the car with Burnett until after it was dark, and there was a console between the driver's seat where Burnett was sitting and the passenger seat where Scott was sitting. (Tr. 82-83). Scott never looked at the speedometer in the car to see whether the car was speeding. (Tr. 83).

### C. Applicable Law

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). "As a general matter, the decision to stop

an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810. Any ulterior motive an officer may have for making the stop is irrelevant. *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) (citing *Whren*, 517 U.S. at 813).

A traffic stop is similar to an investigative detention and is thus governed by the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Finke*, 85 F.3d 1275, 1278 (7th Cir. 1996). Police officers are justified in conducting a brief investigative stop if the officers are "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Although reasonable suspicion requires more than a mere "hunch," it is a measure of suspicion less demanding than that required for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In assessing the reasonableness of a *Terry* stop, the facts are "judged against an objective standard: would the facts available to the officer at the moment of seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (quoting *Terry*, 392 U.S. 21-22).

### D. Analysis

Here, Burnett argues that the officers are not "able to articulate the facts upon which they relied to justify a reasonable suspicion that Burnett was in the process of breaking the law." (DE 35 at 8). Burnett takes issue with the language used by the officers in their testimony at the evidentiary hearing, particularly Officer Fuhrman's use of the words "basically," "it looked like," "zipped," "pretty quick," and "I guess." (DE 35 at 8-9). Burnett argues that these words show that Officer Fuhrman was acting only on a hunch or guess, which does not provide reasonable

8

suspicion. Burnett argues that the officers have not articulated what actions he took while driving that were unsafe or dangerous under the circumstances to justify stopping him for driving at an unreasonable speed, especially as he argues the officers testified they had no idea how fast he was actually driving. Burnett places emphasis on the fact that the officers did not measure the distances he drove or the time he drove prior to being stopped. He further contends that Officer Fuhrman's testimony that he was driving 69 miles per hour but was unable to catch up to Burnett's vehicle does not create any reasonable inference that Burnett was traveling at an unreasonable speed. Additionally, Burnett argues that the officers did not have reasonable suspicion to stop him for allegedly failing to properly signal his turn 200 feet before the intersection, because Officer Fuhrman only guessed as to the distance Burnett's vehicle was from the intersection when the turn signal activated. Thus, Burnett argues that neither officer was able to articulate facts supporting a reasonable suspicion that Burnett was violating traffic laws, and he therefore seeks to suppress all evidence resulting from what he contends was an illegal stop.

In response, the government argues that the officers had reasonable suspicion to initiate the traffic stop, as the officers witnessed Burnett commit two traffic violations, specifically driving at an unreasonable speed and failing to properly signal his turn. The government argues that there is nothing in the unreasonable speed statute's language that requires a determination of the exact speed a vehicle was traveling, and contends that the unreasonable speed statute is by definition subjective "and focuses on the observations of the officer and the totality of the circumstances known to the officer at that time." (DE 38 at 5-6). The government argues that given that the officers were going 69 miles per hour down Hanna Street in an unsuccessful attempt to catch up to Burnett's car, and given that there was other traffic on Hanna Street at the

9

time, the officers properly found Burnett to be driving at an unreasonable speed. Additionally, the government argues that because Officer Fuhrman observed Burnett activate his turn signal contemporaneously with his braking to make the turn, the inference is that Burnett did not signal his intention to turn in compliance with the statute requiring that a turn signal be used for 200 feet before turning.

In his reply brief, Burnett essentially reiterates the arguments made previously in his post-hearing brief, taking issue with the language used by the officers in their testimony and arguing that the officers' guess or hunch was not enough to establish a reasonable suspicion for the stop. While Burnett argues that the officers have "to have some idea of how fast the vehicle is travelling [sic] in order to find a violation of the Indiana law," he provides no citation to authority in support of this argument. Burnett then challenges the government's statement of the turn signal statute in its response, that a "[f]ailure to signal a turn within 200 feet is a violation of Indiana Code 9-21-8-25," because he argues that means he did not break the law so long as he signaled a turn within 200 feet of the intersection, even if he was only a few feet away. (DE 39 at 5 (quoting DE 38 at 3)).

While Burnett argues that Officer Fuhrman and Officer Winston failed to articulate facts supporting reasonable suspicion to justify the stop, because of the words "looked like," "I guess," and "basically," etc., Burnett places too much emphasis on what is normal speech and appears to be stretching to find an argument for suppressing the evidence. The officers' testimony makes it clear that they witnessed Burnett violate two traffic laws, by driving at an unreasonable speed and failing to properly signal a turn, which justified the officers' stop of the vehicle. *See United States v. Tipton*, 3 F.3d 1119, 1122 (7th Cir. 1993) ("The Fourth Amendment is no bar to the

police 'stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if the offense is a minor one.'" (quoting *United States v. Mitchell*, 951 F.2d 1291, 1295 (D.C. Cir. 1991))).

Indiana's unreasonable speed statute states that "[a] person may not drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions, having regard to the actual and potential hazards then existing." Ind. Code § 9-21-5-1(a). Officer Fuhrman testified that Burnett's vehicle "appeared to speed up as it was passing" the officers on Pettit Avenue, then "turned at a high rate of speed" onto Hanna Street, and when the officers turned onto Hanna Street, they were unable to catch up to Burnett's vehicle on Hanna Street despite reaching speeds of 69 miles per hour in an area that had a 30 mile per hour speed limit. (Tr. 9, 27-29). Officer Fuhrman explained that there was other traffic on Hanna street, and he stated that the manner in which Burnett was driving was dangerous, "given the nighttime and the lack of light, and the other vehicles." (Tr. 49). He also stated that the manner in which Burnett turned the corner from Pettit Avenue to Hanna Street was an "excessive" speed "for the corner." (Tr. 49). After being read the text of Ind. Code § 9-21-5-1, Officer Fuhrman testified that in his opinion, the manner in which Burnett was driving was an unreasonable speed. (Tr. 50). Officer Winston's testimony only corroborates that of Officer Fuhrman, as he explained that he personally saw Burnett driving at a speed that appeared to be noticeably above the speed limit, which he considered to be unreasonable or imprudent. (Tr. 69). Officer Winston stated that he cited Burnett for traveling at an unsafe speed, not for traveling in excess of a posted speed limit. (Tr. 73). Scott's testimony that it never seemed to him that Burnett's vehicle was traveling faster than it should be (Tr. 77) does not contradict the officers' testimony that in their opinion,

11

Burnett's vehicle was traveling at an unreasonable speed given the conditions. Scott also admitted that he never looked at the speedometer in the car in order to see what speed Burnett was driving, but he just felt like the car was not going too fast. (Tr. 83). Scott did not explain what he would have thought was "too fast" for the situation; he did not provide the basis for his opinion that the car was not "traveling too fast." (Tr. 77). Thus, Scott could have thought that going 10 miles per hour—or more—over the speed limit was not "too fast." The officers, on the other hand, have the training and experience to provide a basis for their opinion that Burnett's car was traveling in an unsafe manner or at an unreasonable speed. I credit the officers' testimony and find that they have presented specific and articulable facts—namely that they witnessed Burnett driving at an unreasonable speed—which gave them reasonable suspicion and probable cause to stop Burnett's vehicle.

While the Court need not even address Burnett's turn signal violation, as the officers had reasonable suspicion based on witnessing Burnett driving at an unreasonable speed, the officers' observation that Burnett failed to properly signal his turn from Hanna Street onto Sherwood Terrace also gave them reasonable suspicion to stop his vehicle. The relevant statute states that "[a] signal of intention to turn right or left shall be given continuously during not less than the last two hundred (200) feet traveled by a vehicle before turning or changing lanes." Ind. Code § 9-21-8-25. Here, Officer Fuhrman's testimony makes it clear that he witnessed Burnett violate this statute, as he testified that his patrol car was about 200 feet from the intersection at the time Burnett's turn signal came on for the turn onto Sherwood Terrace. (Tr. 33). Officer Fuhrman also testified that Burnett did not activate his turn signal until he was hitting his brakes to turn. (Tr. 50-51). Officer Fuhrman specifically testified that Burnett "signaled, but he did not signal

12

200 feet prior to the turn like Indiana State law says he has to." (Tr. 10). Scott did not testify about when Burnett activated his turn signal, and thus there is nothing to contradict Officer Fuhrman's testimony on this subject. I therefore credit Officer Fuhrman's testimony that he witnessed Burnett fail to properly signal his turn, which gave the officers reasonable suspicion and probable cause to stop Burnett's vehicle.

"A traffic stop does not violate the Fourth Amendment when the police officer has probable cause to believe that a driver has committed even a minor violation of a traffic law." *United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012). I CONCLUDE that Burnett's failure to signal a turn as required by Ind. Code § 9-21-8-25 and Burnett's driving at a speed that was greater than was reasonable and prudent under the conditions in violation of Ind. Code § 9-21-5-1 provided both reasonable suspicion and probable cause for the officers to conduct a traffic stop of his vehicle.[1] *See, e.g., id.* (holding that the officer had probable cause to conduct a traffic stop based on the defendant's failure to signal a right turn); *United States v. Kenerson*, 585 F.3d 389, 392 (7th Cir. 2009) (finding that the defendant's failure to signal his turn gave the officer probable cause to stop the defendant's vehicle).

---

[1] Because Burnett never mentions in his post-hearing brief or reply brief (DE 35; DE 39) the arguments he made in his original motion (DE 19) regarding the search of his vehicle or his person, the Court assumes that Burnett has decided not to proceed with these arguments given the evidence and testimony presented at the hearing. Even if Burnett had raised these issues in his post-hearing brief and reply, however, the Court would not have found in Burnett's favor, as the evidence presented at the hearing established that Officer Fuhrman saw the handgun in plain view at Burnett's feet. (Tr. 12; Gov. Exs. 2 & 3). Where an officer sees a gun in plain view within a vehicle during a traffic stop supported by reasonable suspicion, the gun should not be suppressed as evidence. *See United States v. Booker*, 579 F.3d 835, 840 (7th Cir. 2009) (citations omitted). Additionally, any search of Burnett's person by the officers was justified because the officers had an "articulable suspicion that [Burnett was] concealing a weapon or poses a danger to the agents or others" when Officer Fuhrman saw the handgun at Burnett's feet. *United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001).

*E. Conclusion*

For the above reasons, I CONCLUDE that the officers' stop of Burnett's vehicle did not violate his Fourth Amendment rights. I therefore RECOMMEND that Burnett's motion to suppress (DE 19) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

Dated this 22nd day of February 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge